IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED
BILLINGS DIV.
2010 NOV 15 PM 3 05

PATRICIA E. ...
BY
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MILAN LEE GOUDREAUX,<br><br>Defendant. | Case No. CR-10-14-BLG-RFC<br><br>ORDER |

## I. INTRODUCTION

Defendant Milan Goudreaux is charged by Indictment with sexual abuse (Counts I and II), in violation of 18 U.S.C. §§1153(a) and 2242(2). *Doc. 1.* Presently before the Court is Defendant's Motion to Suppress Statements. *Doc. 20.* Anthony claims oral and written statements he made to law enforcement were obtained in violation of his right to due process and to be free from self-incrimination. After hearing the evidence admitted at the September 28, 2010 suppression hearing, and reviewing the supplemental briefs of the parties, the Court is convinced by a preponderance of the evidence that Defendant's statements were freely and voluntarily made after he knowingly and intelligently waived his Miranda rights.

1

## II.   FACTUAL BACKGROUND

On October 9, 2009, FBI Agents Timothy Boruff and Jordan Kuretich questioned Defendant regarding allegations of sexual abuse of N.H. The interview occurred at the Northern Cheyenne Police Department while he was in custody on tribal charges. The interrogation commenced at 3:20 p.m. and concluded at 6:06 p.m., lasting almost three hours. Defendant was advised of his rights and signed an Advice of Rights form, FD-395 at 3:21 p.m. At the time Defendant was 21 years old.

Defendant was raised on the Northern Cheyenne Reservation in Birney, Montana. Defendant testified at the suppression hearing that he is a high school graduate and received As and Bs in high school, until his last year when he fell behind. *Tr.* at 59-60.[1] Defendant is currently in college and receiving As and Bs. *Id.*

Defendant states agents were "firm" in expressing their disbelief in his position, bringing up his past, confronting him with physical evidence, confronting him with specific incidents of abuse to N.H., telling him he was in much trouble, threatening him with the prospect of a lengthy prison term and what could happen to him in prison, and threatening him with immediate incarceration

---

[1] Transcript of Suppression Hearing on September 28, 2010.

2

if he did not cooperate. Defendant alleges he was told that his cooperation would mean lenient treatment by the prosecution. In response to Defendant's statements, agents would disagree with him and correct him. Defendant did end up consenting to giving agents buccal swabs.

Defendant did admit in his testimony at the suppression hearing that during the interview the agents never raised their voices and although he saw guns on the agents' hips, they never used their guns in any way during the interview. *Id.* at 63. The agents did not stand over Defendant or get in his face or in any way physically harm him. *Id.* Defendant did testify that one of the agents scooted toward him in a chair and told him, "You know, it's okay, you know," when the Defendant was crying. *Id.* at 63-64.

Defendant asserts that he began to agree with the Agents' accusations and telling them what they wanted to hear. Defendant felt worn down and intimidated and was overwhelmed by the circumstances in which he found himself.

Defendant initially denied that he had sexually abused the victim and he provided explanations for what the victim had reported. Defendant explained that he had helped the victim dry off after a shower and may have touched her vagina with his hand while helping her dry off. On another occasion, he stated that he

patted the victim's leg while they were driving in a van together and he may have inadvertently touched her vagina.

When Agents told Defendant that the victim had reported that he had touched her under her pants multiple times, Defendant admitted that he did touch the victim "the way she described it." The Defendant then provided details about the abuse and provided drawings of the locations where the sexual abuse occurred.

At the close of the interview, Defendant agreed to provide a recorded summary of the statements that he had made. The recording started at 5:50 p.m. and lasted approximately ten minutes. During the recorded portion of the interview, Agent Boruff asked Defendant what happened, suggesting alternatives, and Defendant denied as well as admitted details.

At the suppression hearing, Defendant presented testimony of Dr. Bruce Chessen, a psychologist. Dr. Chessen evaluated Defendant and prepared a report. Dr. Chessen testified about tests that he had administered to Defendant, including *Instruments for Understanding & Appreciation of Miranda Rights* (1998); an intellectual functioning test; tests to assess Defendant's emotional state; and "The Structured Inventory of Malingered Symptomatology." On the basis of the results of these test, Dr. Chessen gave an opinion that the Defendant has "a great deal of difficulty with the comprehension of Miranda Rights, especially in his right to

4

remain silent, which he totally misunderstood." Report at 5.[2] Dr. Chessen's report also states in his report: "It is clear that Mr. Goodreaux [sic.] signed a paper acknowledging his Miranda Rights, but he did not appear to understand them well. He was under the impression that if he did not talk to the investigators, he would be sent to jail. He did not understand that he had the right to not speak to them." *Id.* at 5-6.

Defendant testified on direct examination that although he told the agents that he understood his rights, he lied to them because he was scared. *Tr.* at 43-44. On cross-examination, Defendant was questioned about the specific warnings given to him by the agents and he was asked to explain their meaning. Defendant explained the right to remain silent as "That I don't have to talk to them." *Id.* at 67. He explained that anything you say can be used against you in court means what it says, "anything can be used against you in a court of law." *Id.* He then acknowledged that he understood the right in terms of the statement that he made and that it was "evidence in the case." *Id.* He was somewhat confused about his right to talk to a lawyer for advice, but he understood that his defense counsel was his lawyer and that he could talk with him. *Id.* at 67-68. Defendant understood that he had the right to have a lawyer present during questioning, that if he could

---

[2] *Report of Psychological Evaluation* by Dr. Bruce Chessen.

not afford a lawyer one would be appointed, and that if he chose to talk without a lawyer present he could stop answering questions at any time. *Id.* at 68-69.

Defendant also testified that after his interview the agents, tribal jail personnel allowed him to call his cousin and he told his cousin about the interview with law enforcement. His cousin "got mad and told me that was – that I was cohered or something." *Id.* Defendant acknowledged that the word his cousin used was "coerced," and that his cousin told him it meant "I was forced to talk or forced to tell the agents what I didn't do." *Id.*

## III. ANALYSIS

### STANDARD OF REVIEW

Defendant asserts his confession was a product of psychological coercion and must therefore be suppressed as involuntary. It has been long-established that the statement of an accused is admissible in evidence only if it was freely and voluntarily made, without duress, fear, or compulsion in its inducement. This is because the use of an involuntary statement violates the Due Process Clause of the Fifth Amendment. *Colorado v. Connelly,* 479 U.S. 157, 163 (1986). The government must prove voluntariness by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 480 (1972).

6

Although a statement obtained by physical coercion is *per se* involuntary, a statement alleged to be the product of psychological coercion is inadmissible only if, considering the totality of the circumstances, the accused's will was overborne when he made it. *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993), *cert. denied*, 510 U.S. 894 (1993). Before a statement can be deemed involuntary, there must be some evidence of police coercion which is causally related to the statement. *Connelly*, 479 U.S. at 164, 167. The test of voluntariness is whether, considering the totality of the circumstances, the government obtained the statement by either physical or psychological coercion or by improper inducement so that the defendant's will was overborne. *Haynes v. Washington*, 373 U.S. 503, 513-514 (1963).

The Ninth Circuit has articulated a three-factor voluntariness test that considers: (1) the declarant's state of mind, see *United States v. Turner*, 926 F.2d 883, 888 (9th Cir. 1991) ("A defendant's mental state alone does not make a statement involuntary"; rather, "[c]oercive conduct by police must have caused [the suspect] to make the statements."); (2) the physical environment in which the statement was given; and (3) the manner in which the declarant is questioned, including "tone of voice used' by officers and "promises or representations made by the questioner." *Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th Cir. 2002), (citing

7

*Henry v. Kernan*, 197 F.3d 1021, 1027 n.3 (9th Cir. 1999); *see also United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002) (applying voluntariness inquiry under 18 U.S.C. § 3501). The Supreme Court has held that a waiver of Miranda rights must be "made with a full awareness of both the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987).

## PSYCHOLOGICAL EVALUATION BY DR. CHESSEN

On September 2, 2010, Dr. Chessen interviewed Defendant. Before beginning the evaluation, Dr. Chessen advised Defendant of his rights relative to the psychological evaluation. *Report* at 1. Dr. Chessen advised Defendant of the "nature and purpose" of the evaluation verbally and with a form that Defendant "read and signed." *Id.* Dr. Chessen advised Defendant that he had the "right to refuse to participate," and that the "results of this evaluation may be used in court" and "can become public record." *Id.* He was told that his participation was "voluntary," and that his attorney had made the request that he be evaluated. *Id.* It was Dr. Chessen's opinion that "Mr. Goudreaux did not appear to have difficulty understanding these concepts and did not have any questions or request any further explanation." *Id.* The Court takes note that the advisements by Dr. Chessen are quite similar to the advisement of rights given during a Miranda

8

warning. Dr. Chessen was able to make a determination that Defendant understood these concepts.

Dr. Chessen diagnosed Defendant as "Borderline Intellectual Functioning," which means Defendant has "difficulty understanding abstract concepts," and "difficulties in cognitive functions." *Id.* at 3. This finding by Dr. Chessen is directly contradicted by Defendant's testimony at the suppression hearing that he is in college and receives As and Bs. Defendant submitted several affidavits after the suppression hearing from past and present educators of Defendant. *Doc. 44*. The Court finds the contents of these affidavits to be troubling because it appears that the educators who presented the affidavits are willing to make extreme statements to assist Defendant in avoiding personal responsibility in this matter. Pointedly, these educators now assert they gave high grades to the Defendant despite the fact that he did not earn them.

Dr. Chessen also discussed Defendant's results from *the Instruments of Understanding & Appreciation of Miranda Rights* (1998). In Part I of the manual, the stated purpose of the test is described as most relevant to the legal concept of knowing and intelligent and "less relevant for questions of 'voluntariness' of waiver of rights – that is, whether a defendant's waiver was or was not the product of coercion." *Id.* at 4. The manual also discussed three limitations of the test.

9

The first limitation discussed is: "[T]he wording of the Miranda warnings used in the instruments as published may not be the same as those used by police officers in one's own jurisdiction." *Id.* at 7. This can result in "a score on the instruments that suggests poorer or better understanding than the examinee would have manifested for the version of the warnings that police officers actually provided to the examinee." *Id.* Defendant was tested on six vocabulary words entitled "Miranda Vocabulary." Only two of the six words are contained in the rights advisement administered by agents in this case.

The second limitation is: "[E]xaminers should remember that the instruments provide an index of the person's capacities for understanding the Miranda warnings at the time of the evaluation." *Id.* It follows, as the manual recognizes, that the test does not "necessarily indicate the person's level of understanding at the time of police questioning and waiver of the rights," and can depend on "similarities and differences between the examinee's psychological status now and at the time of interrogation as well as circumstances surrounding the interrogation." *Id.* at 7-8. Dr. Chessen's evaluation of Defendant took place almost 11 months after the rights advisement at issue. Dr. Chessen had not evaluated Defendant previously and has no knowledge of Defendant's psychological status at the time of interrogation.

10

The third limitation discussed: "[I]t is important to recognize that the instruments do not measure the validity of Miranda rights, or 'legal competence' to waive Miranda rights." *Id.* at 8. The manual recognizes that the results of the test are a factor to be considered in assessing whether a Defendant knowingly and intelligently waived his Miranda rights.

The most interesting and telling testimony from Dr. Chessen was regarding the administration of "The Structured Inventory of Malingered Symptomatology" that measures whether someone is malingering. The defendant scored 29 on the test. *Id.* at 4. To put the score in context, Dr. Chessen admitted that 14 is the ceiling, meaning that any score above 14 is evidence of malingering. Defendant's score is double the ceiling and, quite frankly, off the charts.

After considering all of the testimony from the suppression hearing and the briefing relative to this issue, this Court finds that Defendant did understand his rights and he made a knowing, intelligent, and voluntary waiver when he was interrogated on October 9. Defendant was unable to show the agents obtained the statement by either physical or psychological coercion or by improper inducement so that the Defendant's will was overborne.

As demonstrated by Defendant when being evaluated by Dr. Chessen and during his testimony at the suppression hearing, he was able to understand an

11

advisement of rights. He knew what was being asked of him on cross-examination and he was able to rephrase the statements.

Additionally, this Court has a difficult time believing what Defendant told Dr. Chessen and the conclusions Dr. Chessen reached that Defendant has "Borderline Intellectual Functioning" and "a great deal of difficulty with the comprehension of Miranda Rights, especially in his right to remain silent, which he totally misunderstood." Dr. Chessen's determination that Defendant "signed a paper acknowledging his Miranda Rights, but did not appear to understand them well. He was under the impression that if he did not talk to the investigators, he would be sent to jail. He did not understand that he had the right to not speak to them" is also highly suspect. "The Structured Inventory of Malingered Symptomatology" shows that Defendant was undoubtedly malingering. Defendant exaggerated or fabricated during his psychological evaluation and it was done for the purpose of secondary gain in that he is attempting to avoid any personal responsibility in this situation.

Defendant's Motion to Suppress is **DENIED**.

DATED this 15th day of November, 2010.

RICHARD F. CEBULL
U.S. DISTRICT COURT JUDGE